WASHINGTON et al. v. AUSTIN NAT. BANK. (No. 5748.)

(Court of Civil Appeals of Texas. Austin. Oct. 17, 1918. Rehearing Denied Jan. 2, 1919.)

1. TRIAL ☞140(1)—CREDIBILILTY OF WITNESSES—PROVINCE OF JURY.

It was the province of the jury to pass upon the credibility of the witnesses.

2. BANKS AND BANKING ☞188½—TRANSMISSION OF MONEY—CONSIDERATION.

In suit to recover damages for wrongful failure of defendant bank to make timely remittance in payment of premium on life policy, where evidence failed to show that agreement to remit on the day in question was based on a valuable consideration, there could be no recovery based upon contract liability.

3. BANKS AND BANKING ☞227(3)—FAILURE TO REMIT PREMIUM—NEGLIGENCE—EVIDENCE.

In suit to recover damages for wrongful failure of defendant bank to make timely remittance in payment of premium on life policy, evidence held insufficient to show that defendant was negligent in not remitting on the day in question.

4. BANKS AND BANKING ☞227(3) — FAILURE TO REMIT PREMIUM — CONTRIBUTORY NEGLIGENCE—EVIDENCE.

In suit to recover damages for wrongful failure of defendant bank to make timely remittance in payment of premium on life policy, evidence held to show contributory negligence on the part of plaintiffs.

5. APPEAL AND ERROR ☞931(4)—FINDINGS TO SUPPORT JUDGMENT—PRESUMPTION.

Where defendant interposed plea of contributory negligence which was not submitted, the statute relating to special issues would require the court on appeal to presume that trial court found that plaintiffs were guilty of contributory negligence if it were necessary to an affirmance of judgment.

6. APPEAL AND ERROR ☞968 — CHALLENGE TO JURORS—ABUSE OF DISCRETION.

Complaint of action of trial court in compelling plaintiffs, after they had exhausted their peremptory challenges, to accept a juror, shown to be a customer of defendant bank for many years, will not be sustained; it not appearing that trial judge abused his discretion.

7. TRIAL ☞306—MISCONDUCT OF JURY.

That some of jurors, in passing upon question of negligence of defendant's agent, stated, in substance, that one of plaintiffs was more guilty of negligence than said agent did not show misconduct.

Appeal from District Court, Travis County; George Calhoun, Judge.

Suit by Stark Washington and another against the Austin National Bank. Judgment for defendant, and plaintiffs appeal. Affirmed.

Rector & Green and Lightfoot, Brady & Robertson, all of Austin (Locke & Locke, of Dallas, on rehearing), for appellants.

White, Cartledge & Wilcox and N. A. Stedman, all of Austin, for appellee.

KEY, C. J. Stark Washington and J. L. Costley, who were partners, brought this suit against the Austin National Bank to recover damages on account of the wrongful failure of the bank to make timely remittance of money in payment of a life insurance premium, on account of which failure the policy was declared forfeited by the insurance·company. The case was submitted to a jury upon special issues, and resulted in a judgment for the defendant, and the plaintiffs have appealed.

The conclusion reached by this court requires an affirmance of the judgment, without the necessity of deciding many of the questions presented in appellants' brief; and therefore it is not necessary to make such an elaborate statement of the case as is contained in that brief.

In 1889, Dr. Wm. H. Tobin obtained from the Provident Savings Life Assurance Society of New York a $10,000 policy, payable to his wife, Benedette B. Tobin. It was a one-year term policy, containing a provision for renewal and extension for one year at a time upon the payment of a stipulated premium. In January, 1901, Dr. Tobin and his wife executed and delivered to A. P. Wooldridge, as trustee for the Austin National Bank, and also to the bank, written transfers and assignments of the policy. In July, 1904, the bank brought suit against the Tobins, and in November succeeding recovered judgment for the amount the Tobins were indebted to the bank, establishing and foreclosing its lien upon the insurance policy, and ordering the same sold as provided by law. In pursuance of that judgment, the policy was sold at sheriff's sale on December 20, 1904, and was bid in and purchased by the City National Bank, the amount of its bid being $500, which was credited on the

judgment. On the 18th day of December, 1905, the bank, pursuant to a resolution of its board of directors authorizing the same, sold the policy to appellants, and on the 5th day of June, 1906, executed and delivered to them a written transfer and assignment thereof. Thereafter appellants paid to the Life Assurance Society all premiums due thereon up to the 31st day of December, 1910, when the society reinsured its business with the Postal Life Insurance Company, since which time appellants paid all the premiums to the latter company up to the 7th day of May, 1913. During the time the policy was held by the Tobins and the City National Bank, they paid all the premiums accruing thereon, amounting to $4,870.20; and after that time appellants paid all the premiums thereon up to the 7th day of May, 1913, including the premium which became due November 27, 1905, which payments aggregated the sum of $5,753.60.

The policy was forfeited, and the money sent to pay the premium returned on account of the nonpayment of the premium due May 7, 1913. The contract of insurance allowed 30 days of grace, during which no forfeiture could be imposed; and therefore appellants had the right to avoid a forfeiture by paying the premium at any time on or before the 6th day of June, 1913.

The proof shows that several years prior to 1913 the City National Bank transferred all of its assets to the Austin National Bank, liquidated its affairs, and went out of business; and thereafter the premiums on the Tobin life insurance policy were paid through the Austin National Bank.

Appellants seek to hold the latter bank liable upon allegations, charging that on the 6th day of June, 1913, they delivered to the defendant bank the necessary funds to procure exchange to be sent to the insurance company in New York, in payment of the premium then due upon the Tobin policy, which premium amounted to $326.43; and that if such exchange had been issued and placed in the post office, addressed to the Postal Life Insurance Company of New York, on the 6th day of June, 1913, it would have been accepted in payment of such premium; and that the defendant contracted and agreed to so issue and transmit such exchange; and that its failure to do so caused the insurance policy to be forfeited. Appellants also claim that if there was no binding contract to issue and transmit the exchange on the 6th day of June, 1913, still, as it was the custom between appellants and the bank for the latter to pay premiums in that manner, and as the bank accepted the funds to pay for the exchange, it was its duty to issue the same, and place it in the mail on that day; and, having failed to do so it was guilty of negligence, and therefore the plaintiffs were entitled to recover.

The defendant's answer contained a general demurrer, numerous special exceptions, a general denial, and a number of special pleas, among which was the plea of contributory negligence on the part of plaintiffs.

The court submitted the case to the jury on the following special issues, to wit:

"Question No. 1. Did Earl Sims, under his employment with the defendant, have actual authority to receive the two checks, aggregating $326.43, mentioned and described in plaintiffs' petition, in payment for New York exchange to be remitted to the Postal Life Insurance Company?

"Question No. 2. Did the said Earl Sims, under his employment with the defendant and in the general course of the business of the defendant, have implied authority to receive said checks referred to in question No. 1?

"Question No. 3. Did the defendant bank, with knowledge that Earl Sims had received the checks referred to in question No. 1 for the purpose of buying New York exchange to be remitted to the Postal Life Insurance Company (if he did so), acquiesce in and ratify the acts of the said Earl Sims in so receiving said checks?

"Question No. 4. Did the plaintiff J. L. Costley inform and direct Earl Sims that June 6, 1913, was the last day that said premium could be paid and mailed or otherwise remitted, and that said premium would have to be mailed or otherwise remitted on that date?

"Question No. 5. Did the said Earl Sims accept said checks and promise and agree to remit said exchange on said date for plaintiffs to the said Postal Life Insurance Company in payment of said premium?

"Question No. 6. If you answer question No. 5 in the affirmative, then you will answer this question: Did the said Earl Sims, at the time of the delivery of the checks to him, have express or implied authority to bind the defendant by an agreement to mail or otherwise remit the premium on the 6th day of June, 1913, to the Postal Life Insurance Company?

"Question No. 7. Did the said Earl Sims, at the time he received said checks for the purpose of buying New York exchange to be remitted to said insurance company (if he did so), know or could he by the exercise of ordinary care have known that said premium would not be accepted by said insurance company unless it was placed in the mails on the said 6th day of June, 1913?

"Question No. 8. Was the witness Earl Sims guilty of negligence (as defined in paragraph No. 3 of this charge) in failing to procure said New York exchange and place the same in the mails on said 6th day of June, 1913?

"Question No. 9. Was the witness Earl Sims guilty of gross negligence (as defined in paragraph 4 of this charge) in failing to procure said New York exchange and place the same in the mails on said 6th day of June, 1913?

"Question No. 10. At the time of the delivery of the checks to Earl Sims, was it within the contemplation of the parties (that is, did plaintiffs and said Sims understand) that the remittance of said premium should be placed in the mails on that day to prevent a forfeiture of said policy?

"Question No. 11. At what hour of the day on

June 6, .1913, were the checks delivered by plaintiffs to the said Earl Sims in the place of business of the defendant bank?

"Question No. 12. Did the Provident Savings Life Assurance Society of New York have notice of the assignment of the Tobin policy to the plaintiffs Washington and Costley, prior to May 7, 1913?

"Question No. 13. Did the Postal Life Insurance Company have notice of the assignment of the Tobin policy to the plaintiffs, Washington and Costley, prior to May 7, 1913?"

The verdict of the jury, and answers to said special issues are as follows:

"Answer to question No. 1: Yes.
"Answer to question No. 2: Yes.
"Answer to question No. 3: Yes.
"Answer to question No. 4: No.
"Answer to question No. 5: No.
"Answer to question No. 6: ———.
"Answer to question No. 7: No.
"Answer to question No. 8: No.
"Answer to question No. 9: No.
"Answer to question No. 10: No.
"Answer to question No. 11: After 3 p. m. o'clock June 6, 1913.
"Answer to question No. 12: No.
"Answer to question No. 13: No."

If no reversible error was committed prior to the rendition of the verdict, and if the answers which the jury made to the fourth, fifth, seventh, eighth, ninth, tenth, and eleventh special issues are sustained by the testimony, we are of the opinion that the trial court rendered the proper judgment, and it should be affirmed. We have carefully examined the statement of facts, and have reached the conclusion that the findings referred to are amply sustained by the testimony.

While the proof shows that it was the long-standing custom of the insurance company, when a notice was sent out designating the last day upon which premiums could be paid, if the money or bank exchange was placed in the post office on that day, the company would accept it as a payment of the premium, although it might be a week or more in reaching the company's office in New York, it was not shown that either the plaintiffs or the defendant's agent, Earl Sims, with whom the plaintiffs dealt, had any knowledge of the fact that, when a policy holder paid the money to a bank, which held a notice issued by the insurance company designating the last day of payment, upon the day so designated, the policy would be forfeited, unless the money or exchange to pay such premium was placed in the post office on that day.

As bearing upon the question of contract between the parties, and negligence upon the part of the bank's agent, Earl Sims, we quote as follows from appellants' brief:

"By appellant Stark Washington it was shown that he had been a customer of appellee for 20-odd years; that he and appellant Costley have been engaged in business together; that appellant Costley always attended to the matter of paying the premiums on the policy in question and giving it the necessary attention; that he and Costley were partners at the time the policy was bought; that appellee always notified them when a premium would become due; that he remembers the time the policy was forfeited, and that on June 6th, having theretofore been notified that that was the last day of grace, he went to the office occupied by him and appellant Costley to see that the premium was paid on that date; that when he got to the office he found that appellant Costley had already drawn the checks and gone to the bank, and at that time it was before 3 o'clock p. m., and that when Costley returned from the bank it was in the neighborhood of 3 o'clock. * * *

"By appellant Costley it was shown: That he had been doing business with appellee for 15 or 20 years and was still doing business with it. That he had borrowed from appellee, deposited with it, had transacted with it in the way of sending money through it by way of exchange. That during all of his business with the bank it had only charged him exchange on one occasion. That banks generally do not charge their good customers for exchange, and that appellee does not charge him for exchange. That appellee bank took over the assets of the City National Bank and wound up its business, and that during the liquidation of the City National Bank he bought the policy in question with other stuff from the City National Bank. That he always has been told and considered that William H. Tobin had an interest in said policy. That he has always paid the premiums for himself and appellant Washington, and has paid the premiums by checks on appellee bank. That until the reinsurance by the Provident Savings Life Assurance Society in the Postal Life Insurance Company he paid premiums to different banks, but that since such reinsurance he has made every payment through appellee bank; that he has received notices of when to pay premiums through appellee bank. That its collector would come up to his office with a letter or notice or would ring him up, or would write him a letter and notify him that the premium was due. That he always paid the premiums to the collector of appellee bank, and usually paid it at the bank; that he has talked to Mr. Folts, the vice president of the bank, and others with reference to the policy. That when he paid a premium he would be given one of the notices stamped 'Paid,' and later on another receipt would come which at times would be sent to him and other times mailed to him. This would be the official receipt. That with reference to the payment that was due on May 7, 1913, he received notice that it was due through Earl Sims, probably two or three weeks or at least some time before it was due, and told him not to fail to let him know in time to send that money off. He testified as follows: 'Earl Sims is the collector for the Austin National Bank. I have known him for several years; he has been employed in the bank for several years. In addition to these premiums I have transacted other business with him. When a draft was drawn on me through the Austin National Bank, Earl Sims collected it. Mr. Sims is the outside collector of the bank. Mr. Wells is there in the bank, and Mr. Sims is with him. They

the both collectors. Some time before the premium actually became due on May 7th, Mr. Sims came up to my office and told me that the premium was due, and I had a certain time to pay it. I told him I wanted to pay it in time to send it off, and not to fail to let me know the last day for him to send it off. He said he would. On the 6th day of June he came up to the office in the morning. I said, "All right; I will attend to it by 3 o'clock or before 3 o'clock." After that he rang up the office on the telephone. * * * He said that was the last day I could pay it to get it off. As to what I did then, I was busy for awhile, but before 3 o'clock I went down to the bank and paid it and got this receipt. In paying the premium I gave them two checks, Mr. Washington's check for half and my check for the other half. I went up to the window and gave Mr. Sims the checks and told him to be sure and get that off, and he said he would. It was just a little before 3 o'clock when I paid him those checks. He gave me one of those little receipts—one of the usual receipts. This is the receipt he gave me at that time (the notice of date May 29, 1913). Mr. Sims put this stamp on the receipt. The stamp shows that it was paid June 6, 1913, to the collector of the Austin National Bank. In sending out these notices, the Postal Life Insurance Company sent self-addressed envelopes along with the notices. I have seen the envelopes with the receipts. I have paid remittances to Earl Sims several times; I don't know how many times before this on June 6, 1913. He had always sent the premiums off. The bank had always theretofore sent the premiums off when I paid same to them. I have never had any trouble about it before.'

"This witness testified further with reference to the transaction at the window of the bank on the afternoon of June 6th; that there was nothing unusual about it. 'I walked up to the window just like I would at any other time; he (Sims) knew what I wanted; I handed them the two checks and said, "I want to pay the premium on the Tobin policy." He said, "All right." He stamped that little receipt, and I said, "You want to be sure to send this off to-day," and he said, "All right." He (Sims) knew it was the last day; he had told me so himself. That conversation was not in a loud tone; it was just in a medium tone of voice. There was nothing unusual about it. After I paid the money in, the Austin National Bank made the remittance; I never had anything to do with it after I gave Sims the checks.'

"That the premium notice has, in big letters, in red ink on the lower part thereof, a statement that the premium payment cannot be made later than June 6th; that it had on the top of said notice in red ink, 'Please return this notice with your remittance'; that the notice was not returned with the remittance, because the bank had the notice, and upon receiving the remittance stamped it paid and turned it over to him as a receipt to him.

"Witness further testified on cross-examination as follows: 'As to whether my idea was that the bank was acting as agent for the insurance company and when I paid that was all, I thought the bank was collecting the money from me and sending it off. My idea was that when I paid the money to the bank it was paid so far as I was concerned. * * * My idea was

that they were collecting that money from me and sending the insurance and that they were doing it for me. I thought that they were over there running after me, collecting money from me and sending it to the insurance company for me. I said they have been doing that for me since 1910, I think; I may be wrong, but I think it is since 1910.'

"Witness stated that he did not speak to any of the officers of the bank on the 6th of June, 1913, about having paid this money into the bank and requested it to be sent off; that he had to pass by the desk of one of the officers to get to the window where Earl Sims was; that Mr. Wells in the bank is the exchange clerk, and generally issues exchange; that Mr. Wells is right by the side of Earl Sims' window; that he did not mention the matter to Wells, as he remembers.

"The following testimony was given by Earl Sims, a witness for the defendant: That he had been in the employ of the appellee bank about 3 years and 4 months; that in June, 1913, he had been in the employ of the bank about 9 months, that his position was collection clerk, and that he was serving in that capacity in June, 1913; that, with regard to his duties, the officers of the bank sorted out the various collections, such as drafts and notes, and anything pertaining to the collection department, and turned the same over to him, and that he presented the same whenever due, and that if they were paid he made remittance, and if not paid he returned the collection; that he does not issue, write, or sign any exchange, except occasionally when the exchange clerk is out, and that sometimes he is put temporarily in the place of the exchange clerk; that he never signed any exchange or letters for the bank, and that he is not authorized to make any contracts or agreements of any kind in behalf of the bank; that he was aware that appellants Washington and Costley held a life insurance policy on the life of Dr. Tobin; that he had occasion to notify them when premiums became due on that policy; that before he went into the bank such notices that premiums would fall due had been coming to the bank, and that he understood that Mr. Costley had requested that when a notice came to the bank the bank should notify him so as not to let the premium pass the last day of grace.

"The witness testified in words as follows: 'And when I went into the bank that was taught me; it just came along as I was learning the business, and when the notices came in I notified Mr. Costley. I don't remember how many I handled, but each one of them was handled in the same way. It was taught me that I should notify Mr. Costley that it would fall due and that it should be attended to. I notified Mr. Costley of the times when the premiums would fall due. Whenever a notice would come it would come to me in my mail in the morning, and, being taught that it should be looked after for Mr. Costley, I would put it in my maturity case and hold it there, and I would notify him when it was due, either by going to his office and telling him, or in some way notifying him.'

"Witness testified that he understood that the notices came to the Austin National Bank because that bank had taken over the business of the City National Bank, and that he supposed no formal transfer on the books of the company

had been made from the City National Bank to appellants; that he remembered notifying Mr. Costley of the premium that was due on May 7, 1913; that Mr. Costley did not make any request of him with reference to that matter at that time; that it just came in the line of his work for him to notify Costley; that Costley said he would attend to it; that he notified him possibly two or three times; that he notified him two or three times on June 6, 1913; that Mr. Costley finally came into the bank on the afternoon of June 6, 1913, about 3:30 o'clock and presented him two checks in payment of the premium; that Mr. Costley made no request of him whatever when to remit it or what to do with it; that it was after banking hours, and that he had no authority to open up the books and transact any business after the bank was closed; that when Mr. Costley called at the bank it was fully half an hour after banking hours, and it was past him to do anything with it; that Mr. Costley made no request as to when he should send it off; that banking hours are from 9 a. m. to 3 p. m.; that the bank occasionally transacted business after 3 p. m.; that if a man comes into the bank after 3 o'clock, the books of the bank being closed, he is waited on as a matter of accommodation; that the transaction does not go into that day's business, but is held over until next day; that the day's business closes at 3 o'clock; that each day's business stands to itself, and the books are closed and balanced each day; that persons coming in after banking hours making deposits, or delivering checks, or requesting any business to be done for them, such does not go on the books that day, but on the books next day; that it is a common thing to put business that comes in after banking hours in the hold-over box; that when a man comes into the bank after 3 o'clock, the item is put into a box and held over until the next day, and it goes on the next day's business; that the two checks that Mr. Costley put in the bank that afternoon were put in the hold-over box, then they were put in the exchange teller's window, and that he made out the draft, and it was signed and sent off on the 7th of June; that Boyd Wells, the exchange teller, has the cage right next to him; that it is a little wire netting between them; they can see each other well from their cages; that Mr. Wells writes the exchange, but does not sign the exchange; that the exchange is signed by some officer of the bank; Mr. Hirshfeld generally signs it.

"Witness further testified as follows: 'I stated that when Mr. Costley came into the bank and handed me those checks he made no suggestion or request with reference to what I should do with them. I do not believe that I recall anything that he said out of the ordinary. * * * I did not agree with him to do anything with those checks. I had no information whatsoever from any source what was necessary, if anything, to be done with those checks on that particular day. * * * I notified Mr. Costley that day that the 6th of June was the last day of grace upon which it could be paid. When he came into the bank and paid me I thought that was the end of it; I thought that that was all that was necessary, and that it was not necessary to remit it then. If it had been called to my attention, if he had said anything whatever about it, I would have looked into it, and

more than likely if he had requested me to send it out I would have sent it out that day. I did not have any authority to send it out; it was not within my jurisdiction. However, I would have looked into it. To send it out on that day it would have been necessary to take it up with the officers of the bank. I had no authority whatever to make any agreement of any kind. As to what would have been necessary to get that remittance on that day, I would have taken it up with one of the officers of the bank, and said: "Here is this insurance premium: Mr. Costley requested it to be remitted to-day, and I suppose you want it sent out"—and more than likely he would have gone over to Mr. Wells and said, "Mr. Costley wants this to go out to-day." Had Mr. Costley made any request, I would have taken it up with the officers of the bank, and that is the way it would have gone through.'

"Witness further testified that he placed the checks in the hold-over box, and the next morning handed them to the exchange clerk, who wrote the exchange and had Mr. Hirshfeld sign it; that Mr. Hirshfeld called it to his attention that the draft should have gone out the day before, the 6th of June; that the last day of grace upon which it could have been paid was the 6th. He testified as follows: 'Mr. Hirshfeld said, "You had better change the date of that letter." I think I had written the letter or remittance slip when Mr. Hirshfeld signed the draft. This slip handed me is the one I refer to. It is a printed form which we use with remittances. The date that was originally on this slip was the 7th. Mr. Hirshfeld directed me to change the 7 to 6, and I simply wrote 6 over the 7. I then mailed it out. I had no knowledge whatever from any source that if the premiums were not paid on the 6th it would affect the policy; I did not know that if it was not sent out on that day it would have any effect on the policy. I did not tell any of the officers of the bank on the 6th that those checks had been handed in to me. Nobody requested that I say anything to them about it.'

"Witness testified to handling other transactions of this nature previous to that time; that the Austin National Bank acted as the agent in making collections for a number of insurance companies, but that the collections were made for the insurance companies, and either deposits made in the bank in their name or else monthly remittances made to them; that the insurance companies sent receipts to the appellee bank; that there is no special way to handle these collections, being same as any other collection.

"On cross-examination this witness testified: That he was 20 years old at the time of the trial. That in June, 1913, he was 16 or 17 years old. That Mr. Folts employed him to work in the bank; that he got his instructions from Mr. Lander, who was the collection clerk in the bank up to the time he took the position, and that he got all his instructions and notions what his duties were from such previous collector. That Mr. Lander told him how to handle this matter of notifying Mr. Costley with reference to premiums. That Mr. Lander stopped and explained it to him fully on the first occasion, and said, 'Now, Mr. Costley has requested that he be notified when the premium against this policy is due.' That was the first notice of that kind that I had seen with reference to the Costley and Washington matter.

That witness remembers he went to work on October 14th, although in his previous deposition he had stated it was in August. That he had refreshed his memory by talking it over with the boys.

"Witness testified as to his recollection to the time appellant Costley came down to the bank as follows: 'As to how it is that I can remember the exact hour when Mr. Costley came down to the bank that afternoon and cannot remember when this other matter occurred, I will state that it is for the simple reason that the next day when this was called to my attention, they said, "Why didn't this go out yesterday?" and I said, "Because he came in about 3:30 or nearly 4." As to whether you did not ask me on the former trial if there was anything that impressed it on my mind and I said that subsequently, at a later date, something occurred about the forfeiture of the policy, I will state that since the former trial it was called to my attention; I admit at that time it was not straight in my mind just how it happened, and I inquired into it just as a matter of information for myself. * * * I think the time when I inquired into it was since the last trial.'

"Witness testified that he admits that he did not swear on the former trial or in his oral deposition that Mr. Hirshfeld had told him to change the 7 to 6, or that the reason he did not send off the remittance was that Mr. Costley came in after banking hours.

"Witness further testified: 'When I went to work in the bank, and when I saw the notice in November, 1912, Mr. Lander explained the matter to me as to why the notices came there, but I did not understand it. The reason was that when I went into the bank I knew absolutely nothing about banking. I didn't know the first principles, and did not know anything about insurance premiums. As to how long it took me to learn the principles, it seemed that every day for six months I got bawled out about something. When I say bawled out, I mean that some officer of the bank would call something to my attention and tell me I would have to wake up. All of them told me I would have to wake up. I think I had been bawled out and told to wake up before Mr. Hirshfeld told me on June 7th that the remittance should have been sent off the day before, and I told him that it was paid after 3 o'clock. I never swore that before in this case. I was asked me on the last trial, but I did not swear it, because I did not know it. Since then I have inquired into it. I could not say who has posted me since the last trial. Just for my own information I asked about it. I do not believe it is a fact that on the last trial Mr. Brady asked me several times what reasons I gave Mr. Hirshfeld for not sending it off the day before; if he did I said I did not know. I said I did not know anything. I said to Mr. Hirshfeld. I do not know who the man is that told me I gave excuses the next morning; maybe I know his name, but I can't call it now. * * * With regard to having told Morris Hirshfeld that it came in after banking hours, I cannot remember the name of the man that talked to me about that since the last trial, because we have discussed it down at the bank. The former trial was only about two months ago, but I cannot remember who it was that has told me that I made that excuse that morning, because we have

so many employés in the bank, and we all discussed it. It was called to my attention by somebody in the crowd.'

"Witness further testified: 'With knowledge of the fact that Mr. Costley had requested that notice be given to him and that he be notified of the last day of payment or last day of grace, I went over to his office once that day and talked to him two or three times about it that day. Mr. Costley came into the bank after 3 o'clock and handed me those checks, and I considered the checks as payment on the policy. I expected Boyd Wells to make the remittance of the premiums. * * * It was Boyd Wells' duty to remit the premiums when the time came to remit it. It was not his business to remit it on the 6th; it was his business to remit it on the 7th. Mr. Wells remitted it on the 7th; he made out the exchange. When I turned the checks over with the request to the exchange clerk to hand me the exchange, he must get the cashier's signature to make a draft, and then it comes back to me, and I make out the remittance slip and put it in an envelope. Under those circumstances I make the remittance. As to why I say it's Boyd Wells' business to remit, the idea is that he issues the exchange; I sent the exchange off to the insurance company. I was doing my duty. I was doing what I was employed to do when I did that on the 7th of June. * * * I stay at the bank until toward five o'clock; some nights I stay until 11 or 12; it takes about two hours to get through with the work. As to my guessing at the time, it was 3:30, and I am not guessing at it. I am positive that it was 3:30 or after. I have nothing whatever to fix it on my mind.'

"Witness further testified: 'With regard to my statement that I did not know that it was necessary to send it off that day, I had seen this notice, where payment will not be accepted later than June 6th. I knew enough to go and tell Mr. Costley not to overlook it that day. As to what made me think it was important, I thought the only thing that was necessary was to get it in the bank. I do not know that I considered the bank the agent of the insurance company, nor did I know that the bank was not the agent of the insurance company. I thought it would be sufficient if the Austin National Bank said, "Mr. Costley paid it on the 6th of June." I thought that would be all that was necessary. I do not know that I knew that the bank was not the agent of the insurance company. It strikes me that we were not the agent of the insurance company, because those things were only notices; they were not receipts. I testified on the former trial that I knew that the bank was not the agent of the insurance company, and that I was sending the money off for Costley and Washington. While I knew the importance of its being paid that day, I did not know that it ought to go off that day, because I was not familiar with it. It had not been explained to me. It was customary for the bank to do this for their customers when requested.'

"Witness further testified: 'With reference to my statement that everything that comes in after 3 o'clock goes on the next day's business, I do not mean to say that we never transact business after 3 o'clock. It is a daily matter for people to come into the bank transacting business. However, it goes in the next day's business. If you go into the bank and pay a

note after 3 o'clock, it would go in on the entries of to-morrow.'

"Witness further testified that the bank issued exchange after 3 o'clock, notwithstanding that it goes on the next day's business; that deposits go on the next day's business; nevertheless the bank takes the money and puts it in the man's passbook.

"Witness further testified: 'I admit that if Mr. Costley had made the request I would have sent it off that day, notwithstanding the transaction would have appeared on the next day's business. We do not get through with all the business by 3 o'clock and have everything posted by that time. * * * We have lots of items that come in after 3 o'clock. If a man comes in at 3:30 p. m. and requests us to send it off that day, if it is urgent we do so. We send it off, but the entries don't go into the books until the next day. If I had been aware of the importance of sending it off on June 6th, I would have been glad to do it. If I had known it was necessary to get it off that day to keep the policy from being forfeited, it would not have been necessary to make any request to send it off, but I was absolutely ignorant of it. If I had known it was absolutely necessary to get it off that day to keep the policy from being forfeited, more than likely I would have sent it off. If I had known the circumstances, more than likely I would have looked after it myself. As to whether I would have sent it off that very day if I had the same knowledge that I have now, I don't know what I would have done under the circumstances; but if I had realized that it was the last day and it was necessary to send it off, without taking any personal responsibility, I would have told him to send it off himself.'

"Witness testified that the exchange clerk usually made the exchange remittances, but further testified: 'I remit money too, and I am the man that had the Costley and Washington premium, and it was my duty to remit it. * * * I do not consider Boyd Wells a man with authority, but if it comes in after 3 o'clock, he is the man to see to it. I am not the man to see to that. When I hold a collection I am the man for the people to come to to pay the money on it. * * * I said that Mr. Costley made no request of any kind when he paid those checks in. * * * I am pretty sure he did not make any request, only he said he wanted to get that notice or send the money into the insurance company. As to whether he shoved the checks in without saying anything, nobody who has 150 people at the window every day could remember that; that is about the extent of it. I remember that Mr. Costley did not make any request of me. I remember that because if he had done so it would have been imprinted on my memory. * * * I remember stamping that notice and handing it to him, but I cannot remember in substance even what he said.'

"Witness further testified that he mailed the remittance of the New York draft some time in the afternoon of June 7th, that it was some time after lunch.

"Witness further testified in reference to his oral deposition that he stated that it was his duty to a customer to send the draft off, and that it was his duty to accommodate a customer, and that he undertook to remit it to the life insurance company; that Costley gave him the checks, and he had them converted into exchange and remitted it to the life insurance company; that he had it turned into exchange as a more convenient and customary form of remittance; that in so acting he was doing his duty as collector, as an employé of the bank; that he was doing his duty as an employé of the bank upon request and for Costley and Washington, who were the bank's customers. He testified that he meant that when he swore it in his deposition.

"Boyd Wells, a witness for the defendant, testified: That he had been working in the bank about 8 years. That his position in the bank in June, 1913, was that of exchange teller, and that he wrote any kind of exchange for customers. That he remembers the occurrence when Mr. Costley paid in some checks about the 6th of June, 1913, and that he remembers that Costley came in at half past 3 o'clock. That he remembers it because Costley was a good friend of his, and that Costley on that afternoon chatted with Mr. Folts and Mr. Morris Hirshfeld, and went on to Earl Sims and gave him two checks and said, 'Here is this money for the insurance business.' That he did not remember the exact conversation, but he saw him when he presented the checks, and that if he told Sims that that remittance must be gotten out that day, he did not hear it, and that he was right close to Sims. That if Costley had spoken in an ordinary tone of voice he would have heard him. That he and Earl Sims are located within a few feet of each other, with only a wire netting between. That he didn't suppose he was working when Mr. Costley came in that evening. That he was listening to Mr. Costley. His day's work was through, and that he did not hear Earl Sims promise to do anything whatever with those checks that were handed in that afternoon.

"On cross-examination he testified that he had occupied exactly the same position that Earl Sims then had, and that he had transacted the same line of business with Washington and Costley, and had remitted the premiums on this insurance policy to the insurance company several times for them—he didn't know how many times—that he knew in a detailed way the nature of the Tobin policy and Costley and Washington's interest in it.

"He further testified: 'I knew in a detailed way the nature of the Tobin policy and the Costley and Washington interest in it; that had been fully explained to me. I would have remitted the premium that day if I had known that a failure to remit it that day would lapse the policy, notwithstanding the fact that it came in after 3 o'clock. I did not know that premium had to be remitted at once. I would have remitted it if I had known that it was the last day of grace, and that a failure to remit it that day would lapse the policy. * * * On the former trial I testified that I would have remitted it that evening if I had known that it was the very last day that it could be paid. If I had known all that I know now on the 6th day of June, 1913, I certainly would have remitted that premium that afternoon. * * * I stay in the bank until 5 o'clock in the afternoon all the time. When I get through with my work I go around and help the other boy.'

"Witness further testified: 'I remember that Mr. Costley came in after 3 o'clock that after-

noon, but I do not undertake to tell the jury the conversation between him and Sims. I think that if he had said anything to Sims about sending it off that afternoon I probably would have heard it and would remember it, because about two weeks later I was reminded of the matter. * * * Mr. Costley came in and said, 'Here are two checks in payment of this policy,' and Earl Sims marked it paid, and that was all. I was paying attention, although I was not particularly interested in the transaction; I was working on my books and making up my figures, and yet I heard everything that was said. I cannot tell of anything that attracted my attention to them and made me listen to the conversation. * * * Customers come in and buy exchange, but they send it off themselves. If a man comes up and gets a draft and asks me to remit it to the company, I do it, but it don't happen more than once a month. It is very seldom that a customer makes that request; it is out of the ordinary. When a man wants to remit money he generally has a letter with him when he gets the exchange, and he generally incloses the exchange in his letter. * * * With regard to the policy involved in this suit, I thought Costley and Washington paid the premium semiannually; I did not know they paid same quarterly. I don't think I testified on the former trial that they paid the premiums quarterly, and that I handled same about 16 times for them. If I did say that it was not true, as I don't think I ever collected the premium over half a dozen times. I was the collector for the bank about 5 or 6 years. I was the immediate predecessor of Earl Sims. Vest Lander succeeded me in that position, and he was succeeded by Earl Sims.'

"Plaintiffs here introduced and read in evidence portions of the testimony of Boyd Wells, given upon the former trial of this case.

" 'Q. Boyd, how many checks have you ever received from Mr. Costley or Washington, or both, in payment of life insurance premium prior to the time you have told about these two checks being paid in? A. I remitted for this same premium of theirs I guess—I think it comes twice a year—must have been about 16 times.

" 'Q. If you had known that day by what Costley said at the time or any other course of information, if you had known that that was the last day of grace, you would have sent it off? A. I certainly would.

" 'Q. You wouldn't have let Sims hold it until the next day? A. No, sir.

" 'Q. Well, now, tell the jury everything that passed between Costley and Earl Sims—tell how the conversation opened up and what was said. A. I don't remember all the details. I just remember he came in there and gave Sims two checks.

" 'Q. Well, what did he say A. I don't remember.

" 'Q. Don't remember a word that was said? A. No, sir.

" 'Q. Can't tell us a single word that was said by Sims or Lee Costley? A. No, sir; I can't.

" 'Q. You had nothing to do with them (meaning the checks) on the 6th at all? A. No more than I have supervision over Earl. He is there under me and I remit for him.

" 'Q. You say you have supervision? A. Well, I am not an officer, but I have to see after him.

He turns his stuff over to me. I tell him when to return items.'

"Plaintiffs introduced and read in evidence portions of the testimony of Earl Sims given upon the former trial of this case, to which the following questions and answers were given:

" 'Q. When was the first time you had your attention directed to the time when Mr. Costley came in with those checks? A. Possibly 5 or 6 or 7 days later.

" 'Q. After this exchange had gone to New York and come back and refused by the insurance company? A. Yes, sir.

" 'Q. And after the bank had found out the insurance company was claiming a lapse of the policy? A. Yes, sir; some week or 10 days after.'

"By W. H. Folts, a witness for the defendant, it was shown that he was vice president of the Austin National Bank; that he has been connected with said bank for 26 years; that he has held every position in the bank up to vice president; that Earl Sims is collector in the bank; that his duty is to go out and collect money or drafts; that he has no authority to make agreements of any kind on behalf of the bank, and has no authority to receive money upon any agreement that it shall be remitted within any certain time, and that he turns over collections to Mr. Wells to have exchange written; that he files letters and does other clerical work; that Earl Sims had no authority to take certain checks from Costley and Washington and agree to remit a draft to the Postal Life Insurance Company on the day the checks were handed to him; that Wells is the proper person in the bank to apply to for exchange; that the reason the Austin National Bank receives the mail addressed to the City National Bank is that the Austin National Bank assumed the liabilities of the City National Bank, took over all their assets, and among those assets were the policy of life insurance on the life of William H. Tobin; that the mail had been received by the Austin National Bank; that the policy of life insurance was sold to Costley and Washington by the directors of the City National Bank; that the appellee Austin National Bank released the policy, and that the money received for it went toward liquidating the indebtedness of the City National Bank; that whenever he saw one of the premium notices he mailed it to Mr. Costley, and did so on several occasions; that prior to learning about the transaction of June 6, 1913, he did not know that any employé of the bank took checks from Mr. Costley and remitted premiums to the insurance company; that the first he knew of it was when he received a letter from the Postal Life Insurance Company that the policy had been forfeited; that Costley has been allowed to overdraw his account only on application; that he had no blanket privilege to overdraw as he saw fit; that he had frequently overdrawn his account; that he has usually made arrangements for such overdrafts * * *

"Witness further stated that he did not know Costley and Washington had been paying to their collector premiums on the policy during the preceding years; that he thought they came in and bought exchange to be remitted in payment of premiums; his impression was that he would go back to his office when he bought

the exchange and remit it; that he did not state that he had not made remittances for Mr. Costley himself, but that he never did so as a collector; that he did not know whether Boyd Wells ever did it or not, but that if he did so nobody in the bank called him down about it; that when he heard the insurance company had forfeited the policy he did not call Earl Sims down for having done something he had no business doing, because there had already been enough after him for having done it; that Morris Hirshfeld is a responsible officer of the bank; that he is cashier of the bank; that it would be in his authority to agree to transmit money for a customer; that the testimony shows that Morris Hirshfeld allowed Earl Sims to write out the remittance slip, put it in an envelope, and send it to the insurance company, and Hirshfeld was not called down for so doing; that he does not mean to say that all the notices with reference to said policy were sent to Mr. Costley, but that he mailed quite a number to him; that the bank never sent receipts to Mr. Costley within his knowledge. * * *

"Witness further testified that, after learning of the forfeiture of the policy, he familiarized himself with the facts surrounding the transaction and how the money came to be remitted and how it came to be sent out a day too late; that he had found that Earl Sims had actually taken Costley and Washington's checks; that the remittance had been made by Earl Sims, and that in the remittance slip he had changed the 7 to a 6; that on September 2, 1913, he gave to Lee Costley a certificate to take with him to New York when he was trying to get a reinstatement of this policy, which reads as follows:

" 'The Austin National Bank.

" 'Austin, Texas, Sept. 2, 1913.

" 'This is to certify that checks dated June 6, 1913, executed by J. L. Costley and Stark Washington, respectively, and aggregating $326.-43, were presented by the above-named parties at this bank on June 6, 1913, in payment of premium due May 7, 1913, on policy No. 29915, issued by the Provident Savings Life Assurance Society of New York on the life of William H. Tobin, and were accepted by this bank to be forwarded in payment of premium.

" 'Wm. H. Folts, V. P.'

"Witness testified as follows: 'In my own handwriting I inserted the words "and were accepted by this bank to be forwarded in payment of premium," in the foregoing certificate, and there is a little explanation I want to make in regard to it.'

"Witness further stated in this connection that he made the above certificate in order to assist Mr. Costley in getting the policy reinstated, but that he did not write a false statement to be shown to the insurance company. He testified in words: 'The things stated in the paper are facts all right enough. The body of the paper is written on the typewriter, and I added in my own handwriting the addition to the effect that the checks were accepted by the bank, to be forwarded in payment of the premium; I did that at the request of Bouldin Rector. He said he wanted it as strong as possible. That addition I made to the paper stated a fact; Sims took the checks that way.'

"Witness further testified that Costley always took quite a number of days of grace allowed him, and that he (the witness) talked with him about it, and told him he had better be careful. He testified: 'I warned him on several occasions to be careful about it; that he was going to forfeit his policy.'

"Witness testified that on his oral deposition, in answer to the following question: 'Q. Have you ever remitted any life insurance premiums for other people besides Mr. Costley and Mr. Washington?'—he answered: 'Oh yes, a great many. * * * Yes; we frequently do it at their request. I say frequently; I will say ocasionally; put it that way.'

"Witness further testified that he had never refused to do so; that he did so for the purposes of remitting life insurance premiums, as well as in other lines of business whenever the bank was called upon to do it, and that such business was in the regular line of banking business.

"Witness testified that Mr. Hirshfeld, the cashier, knew of the remittance of June 6th before it was sent out of the bank, because of the fact that it was signed by Hirshfeld as cashier.

"Witness testified as follows: 'It is not a fact that our bank does not observe the business hours from 9 a. m. to 3 p. m., and that we have to keep the bank open until considerably later than 3 o'clock. The bank is not kept open, but we try to wait on the customers after 3 o'clock, and all the business that comes in after 3 o'clock is held over until the next day. We do not close the doors at 3 p. m. We try to accommodate customers when they come in. All the banks have found it impracticable to hew to the line in regard to the 3 o'clock closing, and quite a number of people come in to transact business after 3 o'clock. However, our books close at 3 o'clock, and the cash has to be balanced. * * * If you should go into the bank at 4 o'clock this afternoon and want to buy exchange, the bank would take your money and give your exchange; that would necessitate some bookkeeping the next day.'

"On redirect examination witness testified that he wrote the certificate above quoted in order to aid Mr. Costley in getting the policy reinstated; that the statement was prepared by Mr. Rector in part, but that it was rewritten at the bank by the stenographer at the bank, and in addition to that he added in his own handwriting the last sentence; that he does not think Mr. Costley said anything to him about the bank's liability until after the certificate was written and he had failed to get the Postal Life Insurance Company to reinstate the policy, but that he did not state as a positive fact that such statement as to the bank's liability was not made before Mr. Costley went to New York, and before the statement was written.

"On rebuttal it was shown by appellant J. L. Costley that appellants, Washington and Costley, never received at any time any notice or other communication from the Postal Life Insurance Company or the Provident Savings Life Assurance Society of New York through the mail; that such companies did not have notice of the assignment from the City National Bank to them, but all the notices and communications came through appellee bank to them; that he stated to Folts, vice president of appellee bank,

directly after the policy was forfeited, that he expected to hold the bank liable, but that his first desire was to get the policy reinstated; that Costley and Washington, appellants, had had possession of the transfer or assignment of the policy at all times since its making in their possession, and while they had several conferences and communications from N. T. Shumate, the state agent of the Provident Savings Life Assurance Society, with reference to said policy, yet that no notice was ever given to either of said companies of their assignment of the same."

[1] There is some conflict in the testimony, especially that given by appellant Costley and Earl Sims concerning what occurred when the former delivered to the latter the two checks on June 6th, and concerning the exact time when such delivery was made. It was the province of the jury to pass upon the credibility of those witnesses, and to accept as true the testimony given by the witness Sims, which testimony supports the finding of the jury to the effect that Costley did not, on the occasion in question, inform Sims that June 6, 1913, was the last day that the premium could be mailed, or otherwise remitted, and did not direct him to make such remittance on that day. His testimony also supports the finding to the effect that Costley did not deliver the checks to him until after 3 o'clock, and that he did not agree to make such remittance on that day, and that he was not guilty of negligence in failing to so remit the premium.

We are also of the opinion that the testimony sustains the finding of the jury to the effect that at the time Costley delivered the checks to Sims, it was not within the contemplation of either that in order to prevent a forfeiture of the policy it was necessary that the remittance of the premium be placed in the mails on that day. True it is that when the remittance was received Sims had before him the notice which had been sent by the insurance company, and which stated on its face that the payment of the premium must be made on or before the 6th day of June, 1913, but that did not show or indicate that if the remittance was placed in the post office on that date it would prevent a forfeiture. As the notice referred to had been placed in his hands as collector for the bank, in the absence of any further knowledge, he might reasonably presume, as his testimony shows he did, that if the money to cover the premium was paid into the bank on the 6th day of June, that fact would constitute payment of the premium within the purview of the notice. It may be conceded that Mr. Hirshfeld and other officers of the bank would have known differently, but the proof does not show that any such officer had any knowledge of the transaction until the following day, which seems to have been too late to prevent the forfeiture, unless it be that the bank was in fact the agent of the insurance company, with authority to collect the premium, a question which is not necessary for this court to decide.

[2, 3] Appellants did not claim that any contract was made with any one connected with the bank concerning the remittance of the money to pay the premium, except Earl Sims; and, while Mr. Costley testified differently, according to Earl Sims' testimony, no agreement was made to the effect that the remittance would be placed in the post office on the 6th day of June, 1913. Besides, if such agreement was made as testified to by Costley, the evidence fails to show that it was based upon any valuable consideration. This disposes of the ground of liability resting upon contract. The other alleged ground of liability which is predicated upon negligence on the part of the bank is also disposed of adversely to appellants by the findings of the jury.

[4, 5] When the question of contract is eliminated, the case stands in this attitude: Primarily, it was appellants' duty, and not the duty of the bank, to see to it that the premium was paid to the insurance company in time to avoid a forfeiture of the policy. The fact that the bank voluntarily undertook to aid appellants in accomplishing that result did not require of it the exercise of that degree of diligence which rested upon appellants, and which would have rested upon the bank if it had entered into a contract to do that which was necessary to prevent the forfeiture. In fact, as it rested under no legal obligation to appellants, it is difficult to see how the bank's negligence, if it had been shown, could relieve appellants from their own negligence in failing to make the remittance themselves, or causing it to be made within time to prevent the forfeiture. That appellants were guilty of negligence in that respect is, we think, quite clear from the testimony, and especially that given by the witness Sims; and as the bank interposed a plea of contributory negligence as a defense, and as that issue was not submitted to the jury, and the court was not requested to submit it, if it were necessary to an affirmance of the judgment the statute relating to special issues would require us to presume that the court found that appellants were guilty of contributory negligence.

We rule against appellants upon all the questions presented in their brief, complaining of the court's charge, the refusal of requested charges, and relating to the admissibility of testimony.

[6] Appellants also complain of the action of the trial court because it compelled them, over their objection, and after they had exhausted their peremptory challenges, to accept a juror who was shown to be a customer of the bank for many years, during which time the bank had sometimes been indebted to him, and he had sometimes been indebted to the bank. The juror testified that the facts referred to would not influence him in

deciding the case; the substance of his testimony being that he had no bias or prejudice as to either party, and could try the case fairly according to the law and the testimony. The trial judge had the juror before him, and was in a much better position than we are to determine his qualifications, and the record does not show that the judge abused his discretion in that regard.

[7] The further contention is made that the case should be reversed because of misconduct of some or all of the jurors. The testimony upon that subject shows that some, if not all, of the jurors, in passing upon the question of negligence upon the part of Earl Sims, stated, in substance, that, in their opinion, appellant Costley was more guilty of negligence than was Earl Sims. In fact, one of the jurors testified that he and perhaps others stated that they were satisfied that somebody was guilty of negligence in not sending off the money to pay the premium in time, but that appellant Costley was the one who was guilty of such negligence, and not Earl Sims. We think the course pursued by the jury, and the statements and arguments referred to, do not show any misconduct. We agree with the jury that some one was guilty of negligence in the matter referred to, and if the jury accepted the testimony of Earl Sims, as they had the right to do, it was quite natural, and not improper, for them to say, in discussing the matter among themselves, that Costley and not Sims was the negligent party. In fact, it would be a difficult matter to make an argument upon the proposition that Sims was not guilty of negligence without making the statement that if any negligence was shown Costley was the person who committed the same.

Appellants were not related to, nor creditors of either Dr. Tobin or his wife; and therefore counsel for the bank contend that appellants had no insurable interest in the life of Dr. Tobin, and that the judgment should be affirmed for that reason. On the other hand, counsel for appellants contend that as the policy was sold to satisfy the debt of a creditor of the Tobins, any one had the right to purchase it, and that the City National Bank who purchased it at that sale had the world for a market, and was entitled to sell it to any one.

The briefs and argument of counsel for the respective parties also present the question as to what would constitute the measure of damage if appellants should recover. The questions referred to, as well as some others presented, are interesting, and some of them are not free from difficulty, but it is not necessary that any of them be decided in this case, and we make no ruling upon them.

No reversible error has been shown, and the judgment is affirmed.

Affirmed.

---

⊜⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes